## WEST INDIA S. S. CO. v. CHICAGO HOUSE WRECKING CO.

(Circuit Court of Appeals, Second Circuit. February 20, 1918.)

### No. 64.

1. SHIPPING ☞104—CONTRACTS—REDUCTION TO WRITING.

Where the parties orally agreed upon a contract of affreightment by water, intending that a written contract should be drawn up, the oral contract was binding, the parties having acted upon it, and it appearing from the forms prepared by each party that there was a meeting of the minds on every material term; and neither party had the right, in preparing a written form, to introduce a new provision in the contract.

2. SHIPPING ☞153—FREIGHT—ACTIONS—EVIDENCE.

Evidence held to sustain libelant's contention that a shipment was transported pursuant to a contract of affreightment previously entered into between the parties, and not under an independent engagement.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the West India Steamship Company against the Chicago House Wrecking Company. From a decree for respondent, libelant appeals. Reversed, with directions.

R. J. M. Bullowa, of New York City (Ferdinand E. M. Bullowa, of New York City, of counsel), for appellant.

Henry J. Mayer, of New York City (Henry B. Gayley, of New York City, of counsel), for appellee.

Before WARD and ROGERS, Circuit Judges, and LEARNED HAND, District Judge.

WARD, Circuit Judge. The Chicago House Wrecking Company having about 18,450 tons of scrap iron to be shipped from Colon, Panama, to the United States, employed one Elliott, a ship broker, to engage freight room therefor. Elliott introduced Harris, president of the Chicago Company, to the libelant, the West India Steamship Company. August 26, 1914, a meeting was had at which terms were discussed, but no agreement arrived at. The scrap iron to be moved was specified, all being large pieces, easily handled, for which a rate of freight lower than that charged for small miscellaneous scrap would be reasonable. The principal difference between the parties was as to the amount of freight rate. August 29th they met again, when the rate of $3.15 a ton was agreed on, as were also the quantity and specific kind of scrap iron to be carried, the times of shipment from Colon, the rate of loading and discharging, the party to do the loading and discharging, the port or ports of discharge, and the demurrage. It was intended that a written contract should be drawn between the libelant and Elliott, who was to be named in it, instead of the Chicago Company, at the request of that company; but this was never done, because the Chicago Company refused to sign the form prepared by the libelant and the libelant refused to sign either of two successive forms prepared by the attorney for the Chicago Company. The reason why the libelant refused to sign the latter was that the Chicago Company wished to insert in the written contract, after the description of the 18,450 tons of scrap, a provision in one of the following forms: "And such other material as owned by the charterer," or with "option of shipping up to 1,000 tons of miscellaneous scrap iron," or "and such iron and steel owned by the charterer and not specifically mentioned." These were matters not agreed upon nor even mentioned at the meeting of August 29th.

[1] The District Judge held that the contract, if orally agreed upon, would be enforceable, notwithstanding it had not been put into writing as contemplated; but he held that the minds of the parties had not met, and for this reason dismissed the libel. We think they had met upon every material term. If the form prepared by the libelant be compared with the two forms prepared by the Chicago Company, it will be seen that there was no substantial difference whatever, except as to the provision above mentioned. Neither of the parties, after the meeting of August 29th, had a right to insert a new provision in the contract. Sanders v. P. B. F. Co., 144 N. Y. 209, 39 N. E. 75, 29 L. R. A. 431, 43 Am. St. Rep. 757.

[2] September 14th the libelant sent the steamer Meridian to Colon, where she loaded a cargo of small miscellaneous scrap known as "American scrap," and sailed to Philadelphia, arriving October 26th. There is a dispute between the parties whether this engagement was an independent one, as the Chicago Company claims, or whether it was carried under the contract of August 29th for 18,450 tons of what is known as "French scrap." The fact that the bill of lading stated the freight to be "according to contract with West India Steamship Company," and that the freight which both parties agreed was $3.15 a ton, the same as that called for in the case of the 18,450 tons, is some indication that the shipment was under that contract. On the other hand, the fact that the scrap was of a different character is an indication to the contrary. The libelant explains taking the same rate of freight for this small stuff by saying that it did not know what scrap was loaded on the Meridian until the arrival of the steamer at Philadelphia. This might well be, as it was only the time charterer of the steamer. However, the testimony of Elliott, the broker, that but one contract was made or talked about, and that was for 18,450 tons of French scrap, convinces us that the libelant's account is true. As we have found that to be an enforceable contract, the Chicago Company is not likely to complain because its liability would be increased by holding that the Meridian's cargo was carried under a different and independent contract.

The Chicago Company, finding that it could not load its steamers in the time originally agreed upon, wanted at the end of September to delay the shipments from Panama until early in 1918, and, this failing, because the libelant needed its steamers then for the sugar season, wanted to cancel the balance of the contract, negotiations which seem to us plainly to recognize the existence of the contract. October 1 the libelant advised Elliott that it had declared the steamer Argo for the next cargo to be ready to load at Colon October 12th. He replied that he thought the date was too early. Receiving no further instructions, the Argo went to Colon, whereupon the Chicago Company advised the libelant that other employment should be sought for the steamer, because it would not be able to load.

October 21st the libelant declared the steamer Evanger to load at Colon on or about November 2d, and following her the Guildhall, to load on or about November 15th, and following her the steamer Berlin. This brought about a telephone conversation with a new attorney for the Chicago Company, who told the libelant that his client would not load these steamers, and that it had better get the best employment for them possible with a view to reducing the loss, but at the same time saying that the Chicago Company did not admit that any contract had been entered into. This was the first repudiation of the contract by the Chicago Company. Down to that time there had been correspondence and negotiations between the parties consistent only with the existence of the contract.

The decree is reversed, and the court below directed to enter a decree in favor of the libelant, with the usual order of reference.